926 P.2d 508

STATE of Arizona, Appellee,

v.

Colette Renee DePIANO, Appellant.

No. 1 CA–CR 92–1855.

Court of Appeals of Arizona, Division One, Department B.

Jan. 10, 1995.

Review Granted June 2, 1995.

Grant Woods, Atty. Gen. by Paul J. McMurdie, Chief Counsel, Criminal Appeals Section, and Crane McClennen, Asst. Atty. Gen., Phoenix, for appellee.

Dean W. Trebesch, Maricopa County Public Defender by Brent E. Graham, Deputy Public Defender, Phoenix, for appellant.

## OPINION

WEISBERG, Presiding Judge.

Colette Renee DePiano ("defendant") appeals her convictions and sentences on two counts of child abuse. For the following reasons, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Defendant is the mother of two sons, ages three and five years old at the time of the incident. At approximately 2:30 a.m. on October 16, 1991, an officer of the Tempe police department found defendant and her sons in defendant's car, with the engine running, in the garage of the house where they were living. The garage was full of smoke and exhaust fumes, as the garage door and the door into the house were closed, and towels had been placed along the bottom of both doors. Notwithstanding, defendant and the children were fully conscious, and did not appear to be suffering any ill effects. The record is unclear as to how long defendant and her children were in the car with the engine running, and whether all of the car windows were closed at the time. Defendant had written a note, found on the dashboard of the car, which police construed to be a suicide note. After taking defendant and her children to a nearby hospital for examination, Tempe police officers placed defendant under arrest.

A grand jury issued an indictment against defendant charging her with two counts of child abuse under Ariz.Rev.Stat.Ann. ("A.R.S.") section 13-3623(B)(1) (1989). Defendant pled not guilty and the case proceeded to trial.

The state theorized that defendant intended to kill herself and her children. Most of the state's case consisted of circumstantial evidence to establish the *scienter* element. The state also relied on testimony of the emergency room physician who treated defendant on the night of the incident. He testified that defendant told him she did not want to live any longer, and he opined that her actions on the night in question were a "suicide gesture." Because A.R.S. section 13-3623(B)(1) requires proof that the conditions defendant created in the garage were likely to produce death or serious physical injury, the state introduced expert opinion testimony to prove that the atmosphere in the garage would have been lethal but for the arrival of the police.

In defense, defendant testified that she was repairing her automobile and was not suicidal. Defendant's witnesses corroborated her statement that the automobile was in need of repair, that defendant was capable of performing the necessary repair work, and that defendant was neither unduly depressed nor suicidal at the time of the incident.

A jury found defendant guilty on both counts, and the trial court subsequently sentenced defendant to the presumptive term of imprisonment pursuant to A.R.S. section 13-604.01: two seventeen year sentences to be served consecutively. Defendant timely appealed pursuant to Rule 31 of the Arizona Rules of Criminal Procedure ("Rule").

## ISSUES PRESENTED FOR REVIEW

1. Did the state's expert witness provide sufficient evidence to support a finding that defendant had placed her children in a situation where their persons or health were endangered, under circumstances likely to produce death or serious physical injury?

2. Was evidence of a prior bad act of defendant admissible under Rule 404(b) of

the Arizona Rules of Evidence where (i) defendant did not raise a timely, specific objection to the evidence at trial, and (ii) defendant's intent and mistake of fact were in issue?

3. Was lay opinion testimony interpreting a handwritten note admissible under Rule 701 of the Arizona Rules of Evidence where the objecting party had broached the subject on cross-examination?

4. Did the jury instruction on reasonable doubt, which stated, "[t]his does not mean an imaginary or possible doubt," constitute fundamental error?

5. Did imposition of two consecutive, flat seventeen-year sentences constitute cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution and Article II, Section 15 of the Arizona Constitution?

## DISCUSSION

A. *The State Introduced Sufficient Proof to Support a Finding of Defendant's Guilt Beyond a Reasonable Doubt*

The substantive criminal statute in question, Section 13–3623(B)(1), reads:

Under circumstances likely to produce death or serious physical injury, any person who causes a child or vulnerable adult to suffer physical injury or, having the care or custody of such child or vulnerable adult, causes or permits the person or health of such child or vulnerable adult to be injured or causes or permits such child or vulnerable adult to be placed in a situation where its person or health is endangered is guilty of an offense as follows:

1. If done intentionally or knowingly, the offense is a class 2 felony and if the victim is under fifteen years of age it is punishable pursuant to [A.R.S.] § 13–604.01.

Defendant correctly cites *State v. Greene*, 168 Ariz. 104, 108, 811 P.2d 356, 360 (App. 1991), in support of her argument that the state was required to show a *likelihood*, rather than the mere *potential*, of harm to her sons from the circumstances in the garage. Defendant challenged the sufficiency of the evidence on this issue, and moved for acquit-

tal at the close of the state's evidence. The trial court denied the motion, and defendant assigns error to that ruling.

We must determine whether there was substantial evidence that defendant committed the crime. Rule 20(a); *State v. Neal*, 143 Ariz. 93, 98, 692 P.2d 272, 277 (1984). In so doing, we view the evidence in favor of upholding the jury's verdict. *Neal*, 143 Ariz. at 98, 692 P.2d at 277; *State v. Gillies*, 135 Ariz. 500, 506, 662 P.2d 1007, 1013 (1983). "Substantial evidence" for these purposes is evidence that "reasonable persons could accept as adequate and sufficient to support a conclusion of defendant's guilt beyond a reasonable doubt." *State v. Mathers*, 165 Ariz. 64, 67, 796 P.2d 866, 869 (1990) (quoting *State v. Jones*, 125 Ariz. 417, 419, 610 P.2d 51, 53 (1980).

In denying defendant's motion, the court, outside the presence of the jury, stated:

Your Rule 20 motion is denied based upon the evidence that indicates that the jury can consider in this matter that obviously the children [are] under the age of 15[;] based upon the evidence there may be some substantial evidence, [f]or at least the jury to infer that defendant's acts were intentional and she placed the children in a situation where each child *could have* put their person or health in danger, or they *could have* suffered death or serious physical injury as opposed to actually suffering death or physical injury.

(Emphasis added). Defendant focuses on the trial court's use of the words "could have" to establish a misapplication of law on this point. Her argument turns on the required showing that there was a likelihood, rather than a possibility or potential, of death or serious physical injury. *Greene*, 168 Ariz. at 107–08, 811 P.2d at 359–60.

We agree that the above-quoted passage appears to misstate the applicable law. Notwithstanding, the evidence supported a finding that there was a likelihood of death or serious physical injury, and the jury was correctly instructed on this issue.

■ The state's expert witness, Gordon Whittaker, testified at length on carbon monoxide emissions and oxygen depletion

caused by defendant's car engine running in the closed garage. Both exposure to certain quantities of carbon monoxide (measured in parts per million or "ppm"), and depletion of oxygen, can be lethal.

Mr. Whittaker testified that carbon monoxide would be dangerous at a level of 5,000 ppm over a 20 minute period. He estimated that the quantity of carbon monoxide in the garage after the car had been running for 20 minutes was approximately 1,700 ppm. He testified that a level of 1,700 ppm "would take longer to be lethal, but it would still be ... lethal." On redirect examination, he explained that exposure to carbon monoxide at 1,700 ppm would result in death over some period of time, and that the carbon monoxide level in the garage after 30 minutes would have been approximately 2,500 ppm. While that level of carbon monoxide, according to Mr. Whittaker, is not necessarily dangerous, reference data also introduced into evidence supported the conclusion that carbon monoxide exposure at levels from 1,000 to 10,000 ppm would lead to unconsciousness and death if continued for 10 to 45 minutes.

Mr. Whittaker also testified that "[l]ack of oxygen has a much more rapid impact on the body than carbon monoxide. Just a few seconds without oxygen would be lethal." He stated that the running car engine depleted approximately 25 percent of the available oxygen in the garage over a twenty-minute period, and that another 15 percent depletion "would probably be lethal."

We hold that the jury could infer from Mr. Whittaker's testimony and from the documentary evidence that defendant's children were likely to die or to be seriously injured as a result of the carbon monoxide levels in the garage. In addition, Mr. Whittaker's testimony regarding the effects of oxygen depletion even more clearly supported a jury finding that death or serious physical harm was likely under the circumstances.

Since the foregoing evidence, taken as a whole, was sufficient to support the verdicts, and since the jury instructions correctly stated the elements of proof required to prove a violation of the child abuse statute, we find that the state met its burden of proof. We decline to reverse the trial court on this issue.

### B. *Prior Bad Acts Evidence*

The state elicited testimony from several witnesses that defendant withdrew $300 from the bank account of Jeff Claus, her ex-boy-friend, shortly before the subject incident. She did not have Claus' permission to take the money. Defendant maintains that evidence about the withdrawal should have been excluded under Rule 404(b) of the Arizona Rules of Evidence, and that its admission violated her right to due process of law under the Fourteenth Amendment to the United States Constitution and Article II, Section 4, of the Arizona Constitution.

Appellant's opening brief contains three excerpts from the trial transcripts showing the circumstances under which this testimony was admitted. Only the first excerpt reflects any attempt by defendant's trial counsel to object to the question or to strike the response—a necessary prerequisite to appellate review of the admissibility of the evidence. Ariz.R.Evid. 103(a)(1). That objection was made during the state's direct examination of Jeff Claus.[1]

 "Absent fundamental error, error is usually considered to be waived on appeal unless it was objected to at trial." *State v. Holder*, 155 Ariz. 83, 85, 745 P.2d 141, 143 (1987). Even where an objection is made, it does not preserve an issue for appeal unless it is timely and sufficiently specific. *State v. Hamilton*, 177 Ariz. 403, 408, 868 P.2d 986, 991 (App.1993). "A general objection, such as 'irrelevance,' will not be sufficient to preserve the issue for appeal. Furthermore, an objection to the admission of evidence on one ground will not preserve issues relating to the admission of that evidence on other grounds." *Id.* (citations omitted). Even constitutional objections are waived unless they

---

1. Defendant also filed numerous motions *in limine* before and during trial, one of which arguably addressed the issue of testimony regarding this prior bad act. Because we find that all of the testimony on this issue was properly admitted, it is unnecessary to determine whether defendant's motion adequately preserved this issue for appeal.

are raised at trial in a timely manner. *State v. Hernandez*, 170 Ariz. 301, 306–07, 823 P.2d 1309, 1314–15 (App.1991) (hearsay objection did not preserve issue that testimony violated Confrontation Clause).

■ The trial transcript reveals that defendant did not make a timely, specific objection:

Q [by the state]: Did [defendant] say something specifically that indicated to you that she was sad or upset?

[defense counsel]: Objection. Irrelevant, your honor.

The Court: Overruled.

The Witness [Jeff Claus]: She said that, you know, she was hurting, too. It wasn't easy for her. She admitted taking some money from my account. And that is about it.

Defendant's counsel did not move to strike the witness' response, and it is readily apparent that the objection, when lodged, did not go to the issue defendant now raises: that evidence of prior bad acts was admitted for the impermissible purpose of showing propensity to commit the crime charged. Moreover, it seems unlikely that the state asked this question for the purpose of eliciting information on the unauthorized withdrawal. As in *Grant v. Arizona Pub. Serv. Co.*, 133 Ariz. 434, 450, 652 P.2d 507, 523 (1982), defendant's expressed basis for her objection—that the subject of the question posed was "irrelevant"—was insufficient to preserve the separate issue of whether the evidence was admissible under Rule 404(b) of the Arizona Rules of Evidence. This issue was not properly preserved and, as such, it is waived.

Defendant's fundamental error argument is equally unavailing. Defendant correctly cites *Jammal v. Van de Kamp*, 926 F.2d 918 (9th Cir.1991), for the proposition that admission of evidence offends due process "[o]nly if there are *no* permissible inferences the jury may draw from" it. *Id.* at 920. Even then, the evidence does not implicate the Fourteenth Amendment Due Process Clause unless it is "of such quality as necessarily prevents a fair trial." *Id.* Defendant's argument fails in this instance because there was a permissible inference to be drawn from this evidence.

■ Rule 404(b) of the Arizona Rules of Evidence permits evidence of other crimes, wrongs, or acts to show intent or absence of mistake. Here, defendant's intent and absence of mistake were both in issue. She maintained that she did not intend to harm her children, and that she did not appreciate the danger, if any, posed by the exhaust fumes. The state theorized that defendant was depressed to the point of attempting to kill herself and her children, partly because of her dire financial need. Her theft of $300 goes to that issue. *See State v. Sparks*, 147 Ariz. 51, 55–56, 708 P.2d 732, 736–37 (1985) (evidence that defendant had been embezzling money from victim's business showed motive for killing victim).

Finally, we note that the court gave a proper limiting instruction to circumscribe the jury's consideration of the "bad acts" evidence. In any event, we find no error and no violation of due process.

C. *Defendant Waived Objection to Lay Opinion Testimony on the Meaning of her Note by Introducing Lay Opinion Evidence on this Issue at Trial*

Police found a note, written by defendant, on the dashboard of the car. The note was admitted into evidence and several lay witnesses provided their interpretation of the note.

Defendant had anticipated possible lay opinion evidence regarding the note and therefore moved *in limine* to preclude it, relying on Rule 701 of the Arizona Rules of Evidence. In arguing the motion to the trial court, defendant's counsel cited the witnesses' lack of expert qualifications necessary to allow their opinions on the meaning of the note. The trial court ruled that lay opinion testimony would be admitted subject to proper foundation evidence.

■ The state raises a threshold question which must be resolved before we can entertain defendant's argument on the applicability of Rule 701 to the lay opinion testimony in question: Did defendant waive the right to object to that testimony by "opening the

door" on the issue? The first lay opinion testimony about the meaning of the note occurred during *defendant's* cross-examination of James Quill, the Tempe police officer who discovered defendant and her children in the car. The transcript shows the following:

Q [by defendant's counsel]: Now, you read that note several times by now, haven't you?

A: I haven't read it since the day of the occurrence, no.

Q: But you would agree with me, wouldn't you, there are certain portions of that note that are subject to different types of interpretation?

A: Yes.

The state contends that in asking the second question in the above-quoted passage, the defendant "opened the door" to lay opinion testimony on the meaning of the note. The state argues that "a party may not object on appeal to the admission of evidence when the party itself introduced the evidence or opened the door to its admission," relying on *State v. Cook*, 170 Ariz. 40, 51–52, 821 P.2d 731, 742–43 (1991).

Defendant's question seems to have opened the door just a crack. As it happened, a vast amount of lay testimony found its way through this rather small opening. Nonetheless, the decision to admit countervailing lay opinion testimony on the meaning of the note was within the sound discretion of the trial court, and we find nothing so egregious in the trial court's rulings on this issue as to warrant reversal. *See Groener v. Briehl*, 135 Ariz. 395, 398, 661 P.2d 659, 662 (App.1983).

■ We also note that any error engendered by admission of the lay testimony would be harmless error because the note itself was admitted into evidence. The jurors were able to draw their own conclusions based upon their own reading of the note, and their own perception carried more weight than the opinion of any third-party lay witness. *State v. Amaya–Ruiz*, 166 Ariz. 152, 167–68, 800 P.2d 1260, 1275–76 (1990), *cert. denied*, 500 U.S. 929, 111 S.Ct. 2044, 114 L.Ed.2d 129 (1991) (improperly admitted lay opinion testimony concerning similarity of bloody footprint and tread pattern of defendant's tennis shoe was harmless where photograph of footprint and shoe were both admitted into evidence). We therefore hold that the admission of the lay opinion testimony did not constitute reversible error.

D. *The Jury Was Properly Advised of the State's Burden of Proof*

■ The trial court gave the following instruction to the jurors to guide their consideration of the state's burden of proof:

Reasonable doubt means doubt based upon reason. This does not mean an imaginary or possible doubt. It is a doubt which may arise in your minds after a careful and impartial consideration of all the evidence or from the lack of evidence.

Defendant argues that this instruction "excluded a possible doubt, lessened the state's burden of proof … and was … constitutionally defective." Defendant cites *State v. Chavarria*, 145 Ariz.Adv.Rep. 61 (App. Aug. 19, 1993) in support of her argument, and notes that she did not object to this instruction. She contends that her failure to object was not fatal to her appeal on this issue because use of the instruction constituted fundamental error under *State v. King*, 158 Ariz. 419, 424–25, 763 P.2d 239, 244–45 (1988).

Defendant may not rely on *Chavarria* since that opinion has been withdrawn. We also note that defendant overlooked the recent Arizona Supreme Court decision of *State v. West*, 176 Ariz. 432, 444, 862 P.2d 192, 204 (1993), which held that use of the quoted instruction does not constitute fundamental error. *Accord, State v. Duzan*, 176 Ariz. 463, 469–70, 862 P.2d 223, 229–30 (App. 1993). We believe that these decisions effectively dispose of defendant's argument on this issue.

■ Defendant also argues that the prosecutor's comments in her closing statement misadvised the jury about the meaning of reasonable doubt. Specifically, defendant complains of the following passages:

Now, you may find yourself in part of her story saying, "well, it's possible." Defense counsel often argues what is possible, what

is probable, but you are not here to decide the possibilities, or the probabilities.

You may hear some things about the state's burden beyond a reasonable doubt. You are not here to explore the possibilities.

These comments may be confusing, particularly when taken out of context as they are here, but they are not so misleading that they take "from the defendant a right essential to [her] defense." *State v. Smith*, 136 Ariz. 273, 277, 665 P.2d 995, 999 (1983). As such, they do not give rise to fundamental error, and defendant's failure to object at trial obviates further consideration of this issue.

E. *The Trial Court's Pronouncement of Two Consecutive, Flat Seventeen-Year Sentences Does Not Constitute Cruel and Unusual Punishment*

Defendant received presumptive seventeen-year sentences for both of her convictions. The applicable statutes require that she serve her sentences consecutively, and provide no possibility for probation or parole. *See* former A.R.S. § 13–604.01(E), (J) (1989).

Defendant urges us to remand this case for resentencing on the ground that her sentences violate the cruel and unusual punishment provisions of the United States and Arizona Constitutions. *See* U.S. Const. amend. VIII; Ariz. Const. art. II, § 15. She concedes that relief on this issue requires a threshold finding that her sentences were grossly disproportionate to the crime. Only if this is the "rare case in which a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality," must we then proceed to a comparative analysis of sentencing within and between jurisdictions. *State v. Bartlett*, 171 Ariz. 302, 304, 830 P.2d 823, 825 ("*Bartlett II*") (quoting *Harmelin v. Michigan*, 501 U.S. 957, 1005, 111 S.Ct. 2680, 2707, 115 L.Ed.2d 836 (1991) (Kennedy, J., concurring)) *cert. denied*, 506 U.S. 992, 113 S.Ct. 511, 121 L.Ed.2d 445 (1992). Defendant argues that this *is* the rare case and provides a comprehensive intra- and inter-jurisdictional analysis in furtherance of her position.

The state, on the other hand, summarily concludes that the sentence is not grossly disproportionate because, if defendant had succeeded in the attempt to take her children's lives, she would have been prosecuted for first degree murder, in which case she would have received either the death penalty or life imprisonment with no possibility of release for seventy years. Based on that conclusion, the state declines to engage in any further disproportionality analysis.

The Eighth Amendment "forbids only extreme sentences that are 'grossly disproportionate' to the crime." *Harmelin v. Michigan*, 501 U.S. 957, 1001, 111 S.Ct. 2680, 2705, 115 L.Ed.2d 836 (1991) (Kennedy, J., concurring) (quoting *Solem v. Helm*, 463 U.S. 277, 288, 103 S.Ct. 3001, 3008, 77 L.Ed.2d 637 (1983)). *Solem* stands as controlling precedent for purposes of analyzing the gravity of the offense and the harshness of the penalty—the threshold step in an Eighth Amendment proportionality analysis. *Id.; Bartlett II*, 171 Ariz. at 305, 830 P.2d at 826. We review Eighth Amendment challenges "on a case-by-case basis, according to the circumstances of the particular crime." *State v. Bartlett*, 164 Ariz. 229, 233, 792 P.2d 692, 696 (1990) ("*Bartlett I*"), *vacated*, 501 U.S. 1246, 111 S.Ct. 2880, 115 L.Ed.2d 1046 (1991).

*Solem* identifies numerous factors to be taken into consideration in the initial stage of the proportionality analysis. *Bartlett II*, 171 Ariz. at 306–07, 830 P.2d at 827–28 (citing *Solem*, 463 U.S. at 294, 103 S.Ct. at 3011). These factors include the type of harm threatened or inflicted upon the victim or society, the level of defendant's culpability, as measured by the seriousness of the crime and against whom it was committed, and the level of violence employed. *Solem*, 463 U.S. at 292–93, 103 S.Ct. at 3011; *Bartlett I*, 164 Ariz. at 234, 792 P.2d at 697. If this is the "rare case" in which the examination of these factors raises a presumption that the sentence imposed was grossly disproportionate to the crime committed, we then must undertake a comparative sentencing analysis. *Bartlett II*, 171 Ariz. at 304, 830 P.2d at 825.

The Arizona legislature possesses broad authority to determine the types and limits of punishments for crimes, and we give sub-

stantial deference to that authority. *Bartlett I*, 164 Ariz. at 233, 792 P.2d at 696. Further, mandatory consecutive sentencing has previously withstood eighth amendment challenges in the context of crimes against children involving child molestation, sexual offenses, and drug sales. *See State v. Jonas*, 164 Ariz. 242, 792 P.2d 705 (1990); *State v. Taylor*, 160 Ariz. 415, 773 P.2d 974 (1989); *State v. Byrd*, 160 Ariz. 282, 772 P.2d 1135 (App.1988); *State v. Crego*, 154 Ariz. 278, 742 P.2d 289 (App.1987). Our review of this issue is limited to the constitutionality of Arizona's sentencing provisions as applied to the particular facts and circumstances of this case.

### Harm Caused or Threatened to Victims and Society

Although there was no actual physical harm to defendant's sons, the *threatened* physical harm was severe. Defendant knowingly or intentionally attempted to murder her two young children. But for police intervention, society also would have been harmed by the loss of the children. We conclude that the harm threatened by her crimes is manifest.

### Seriousness of the Crime

The Arizona legislature considers dangerous crimes against children as among the most serious crimes possible. *Jonas*, 164 Ariz. at 249, 792 P.2d at 712. Child abuse is a serious crime even when, as here, it does not result in the kind of physical violence or malignant neglect connoted by the term "child abuse." Although she was thwarted, defendant attempted to murder her children. That attempt constitutes a serious crime.[2]

### The Victims

The potential victims were defendant's young children, ages three and five, who had been entrusted to her care. Our legislature has recognized the particular vulnerability of such young children and has enhanced the sentencing for whole categories of crimes deemed to endanger them. *See* A.R.S. § 13–604.01. We cannot and do not quarrel with the legislature's response to the problem of child abuse.

### The Level of Violence

Although defendant was thwarted, the level of violence attempted by her was the most extreme recognized by law: the deaths of her two children. We therefore reject defendant's argument that the lack of resulting physical violence to her children is to her credit.

### Other Mitigating and Aggravating Factors

"[T]he question of 'gross disproportion' cannot be resolved without considering all of the factors that aggravate or mitigate the crime." *Bartlett II*, 171 Ariz. at 307, 830 P.2d at 828. In the instant case, the trial court considered the lack of injury to the children and defendant's lack of a prior criminal record as mitigating factors. Additionally, the record indicates that she had been a competent parent prior to this incident.[3]

Aggravating factors include defendant's denial that she attempted suicide or intended to harm her children, her denial that she had any mental health problems, and her lack of remorse. Furthermore, the trial court considered that defendant became a fugitive when the jury returned its verdicts, although she voluntarily surrendered herself to custody some three months later. The trial court

---

**2.** We cannot accept defendant's argument that her attempt to commit suicide somehow minimizes her attempt to murder her children. It is one thing to decide to end your own life, but quite another to selfishly include defenseless young children. This is especially true where the victims are within the special parent-child relationship.

**3.** We disagree with the dissent that an additional mitigating factor is that defendant's convictions and consecutive sentences arise out of a single

act. The defendant's "single act" of attempting to murder her two young children neither suggests nor requires that she be punished for one crime rather than two. *See State v. Miranda*, 3 Ariz.App. 550, 558, 416 P.2d 444, 452 (App.1966) (affirming three consecutive sentences after finding three separate offenses of manslaughter where one automobile accident resulted in three deaths: "[T]he wrongful killing of each human being should be treated as a separate offense.").

concluded, and we agree, that the mitigating and aggravating factors were evenly balanced. It therefore sentenced defendant to the presumptive terms of imprisonment.[4]

### Defendant's Culpability

Defendant's culpability is clear. She acted methodically and on her own initiative. The state proved that she was driven to the point of suicide on October 16, 1991, even though defendant argued at trial that she was optimistic at that time rather than suicidal. On appeal, defendant now asserts that she was "chronically depressed" and cites her depression as a factor in mitigation, despite the fact that that assertion is the very antithesis of her trial posture. Nevertheless, we are duty bound to overlook the inconsistency between defendant's positions and acknowledge that financial and emotional pressures were brought to bear on her immediately prior to her crime. Those pressures are germane to the inquiry, and they render defendant's actions less wanton. Unfortunately, a more meaningful review of defendant's psychological condition is impossible for want of competent evidence on this issue.[5]

Despite her denial of psychological problems at trial, defendant could have presented evidence at sentencing regarding her psychological condition, but chose not to do so. If sufficient mitigating evidence had been presented, it would have been within the power of the trial court to give defendant two consecutive mitigated sentences of twelve years imprisonment. *See* former A.R.S. § 13–604.01(D) (1989). That opportunity, however, was lost only by defendant's decision to not present such evidence.

Finally, we are not persuaded by the dissent's argument that defendant's only motive was to commit suicide, not to kill her chil-

dren. Although one of defendant's motives was suicide, we note that her children did not wander into the garage or enter the car by accident: they were awakened from their beds between 1:00 a.m. and 2:00 a.m. and intentionally placed in a life-threatening situation by defendant who intended that her children die with her. Had defendant's only motive been to commit suicide, she could have done so. Instead, she attempted to murder her children as well. Accordingly, we conclude that defendant's intent, which was to kill her children as well as herself, does not diminish her culpability.

### The Sentences Did Not Constitute Cruel and Unusual Punishment

We conclude that, under the circumstances of this case, the imposition of two consecutive seventeen-year sentences is not unconstitutionally cruel and unusual. The sentences are not grossly disproportionate in light of the fact that defendant intentionally attempted to murder her children. We acknowledge that it is the legislature's prerogative to severely punish those who attempt to injure or murder children. Requiring consecutive sentences will advance the goal of the criminal justice system to protect children by punishing child abusers, especially when we are dealing with serious crimes against the wrongdoer's own children. Just as important, not adequately punishing child abusers, at least in the eyes of the Arizona legislature, would lead to even greater instances of child abuse.

The trial court properly considered both mitigating and aggravating factors and sentenced defendant to the presumptive terms. The resulting sentences are not unconstitutionally cruel and unusual.

4. We also note that the pre-sentence investigator, after interviewing defendant and various witnesses, recommended that defendant be sentenced to the presumptive terms.

5. Defendant states that she "had been diagnosed as chronically depressed." As authority for this statement, defendant cites us to a portion of the transcript in which the prosecutor was arguing for admission of evidence of defendant's "prior mental history" and defendant was arguing for exclusion. In that exchange, which took place outside the presence of the jury, the prosecutor represented to the court that there was a diagnosis of chronic depression. That representation does not constitute evidence. When the state attempted to develop this point on cross-examination, defendant denied that she had ever been treated for depression, stating that her in-patient treatment at Camelback Hospital in 1990 was for "a hormone deficiency." Thus, there is no evidence in the record to support defendant's assertion that she was chronically depressed.

## Comparative Sentencing

Although it is not necessary to do an intra- or inter-jurisdictional comparative sentencing analysis because we hold that the punishment is not disproportionate to the crime, *see Bartlett II*, 171 Ariz. at 304, 830 P.2d at 825, we choose to address the comparative sentencing analysis set forth by the dissent.

### Intra–Jurisdictional

The dissent notes that "[t]he sentence received by defendant was the harshest penalty ever imposed in an Arizona child abuse prosecution reported in our cases." He concludes that defendant's sentence was therefore disproportionate because the cases cited reveal more serious abuses. We note, however, several important distinctions between the instant case and the cases cited by the dissent.

First, none of the cases cited involved more than one child, and hence were not subject to consecutive sentencing under A.R.S. section 13–604.01. Therefore, a comparison between actual years sentenced is meaningless. For example, the defendant in *State v. Lopez*, 174 Ariz. 131, 847 P.2d 1078 (1992) *cert. denied*, 510 U.S. 894, 114 S.Ct. 258, 126 L.Ed.2d 210 (1993), received an aggravated sentence of twenty-two years imprisonment. Had Lopez committed his abuse against *two* children, he would have been sentenced to forty-four years of imprisonment—ten years longer than this defendant.

Second, although the defendants in *State v. Tamplin*, 146 Ariz. 377, 706 P.2d 389 (App. 1985) and *State v. Poehnelt*, 150 Ariz. 136, 722 P.2d 304 (App.1985) received shorter terms of imprisonment, they did receive the presumptive sentence that was *in effect at that time*, as did the defendant in this case. We consider it likely that it was *in response* to crimes such as these that the legislature

determined that the sentences for child abuse needed to be enhanced.

Finally, in support of his argument, the dissent compares the presumptive terms for a number of violent crimes in Arizona and notes that multiple sentences need not be imposed consecutively for those crimes. The distinguishing factor, however, is that none of the crimes compared were committed against children. We do not agree that the enumerated crimes are necessarily "more serious" than a parent's attempt to murder her children.

Again, the legislature has determined that dangerous crimes against children are among the most serious crimes possible. It is the legislature, not this court, that determines the prison terms for defendants convicted of abusing children. This court must "uphold as constitutional a sentence that [has] a rational basis." *Bartlett II*, 171 Ariz. at 313, 830 P.2d at 834 (Corcoran, J. dissenting) (citing *Harmelin*, 501 U.S. at 1003–04, 111 S.Ct. at 2706). The Arizona legislature has determined that Arizona's defenseless young children need greater protection from abusive adults. A rational basis exists for the legislature to conclude that the intentional or knowing attempted murder of children is more serious than manslaughter, kidnapping, aggravated assault, or even the attempted murder *of an adult*. We do not quarrel with that decision.

### Inter-jurisdictional

The dissent further argues that Arizona has the harshest penalties in the nation for child abusers, that the next closest state has a maximum sentence of ten years,[6] and that the disparity is even greater because the other states allow the possibility of parole.

The mere fact that A.R.S. section 13–604.01 precludes the possibility of parole does not make a sentence cruel and unusual. *Jonas*, 164 Ariz. at 251, 792 P.2d at 714.

---

**6.** We note that defendant could have been charged with attempted murder rather than child abuse in any such state. Had she been so charged, defendant could have received a maximum sentence *in excess* of that given here. *See, e.g.*, N.C.Gen.Stat. §§ 14–1.1, –2.5, –17 (maximum term of 40 years on *each* count); Ohio Rev.Code Ann. §§ 2903.01(A), 2923.02, 2929.11

(Baldwin 1992) (maximum term of 25 years on each count); Okla.Stat.Ann. tit. 21, § 651 (West 1993) (maximum term of life imprisonment); Tenn.Code Ann. §§ 39–11–117, 40–35–112 (1991) (maximum term of 25 years on each count); Utah Stat.Ann. §§ 76–3–203, 76–4–102, 76–5–202 (1990) (maximum term of life imprisonment).

"The nonexistence of parole provisions in mandatory minimum sentences historically has been upheld as constitutional." *Id.*

■ Moreover, the fact that one state has the distinction of setting the most stringent prison sentence for a particular crime does not render such punishment "grossly disproportionate" to the offense or to the punishment dictated by other states. *Rummel v. Estelle*, 445 U.S. 263, 281, 100 S.Ct. 1133, 1143, 63 L.Ed.2d 382 (1980). One state will (unless equalled by another state) always hold the distinction of treating particular offenders more severely than any other state. Requiring only a comparison of the harshest state to the second harshest state, etc., would lead to a continuum that would mean that the penalties imposed by the harshest state must always be reduced. This type of review, standing alone, means that a state can never be in the vanguard of adopting appropriate penalties to address an evolving problem. Unlike the statutory rape charge in *Bartlett II*, child abuse is **not** a crime for which penalties are becoming less harsh. Rather, it is an area in which more severe penalties are generally being deemed appropriate.[7]

This is neither a bad check case (*Solem*) nor a statutory rape case involving a young and immature adult (*Bartlett I & II*). This case involves two counts of child abuse arising out of the intentional attempted murder of two young children by their parent. Under these circumstances, we do not find that the imposition of consecutive seventeen-year sentences is cruel and unusual punishment.

## CONCLUSION

The issues raised on appeal do not warrant either the reversal of defendant's convictions or resentencing. We have reviewed the record for fundamental error and found none. A.R.S. § 13–4035. For the foregoing reasons we affirm defendant's convictions and sentences.

JACOBSON, J., concurs.

STEPHAN A. GERST, Superior Court Judge, dissenting.

Respectfully, I dissent from the majority's conclusion that this is not the "rare case" in which the crime committed and the sentence imposed are grossly disproportionate. Defendant's sentence of 17 years for each of two counts, to be served consecutively, without possibility for suspension or commutation of sentence, probation, pardon, parole, work furlough, release from confinement, or the ability to earn release credits, is excessive and in violation of the prohibition on cruel and unusual punishment contained in the Eighth Amendment to the United States Constitution and article II, section 15 of the Arizona Constitution.

It is not the purpose of this dissent to quarrel with the legislative prerogative or to suggest that the statute under which the defendant is charged is unconstitutional. It is, however, a judicial responsibility to examine the particular circumstances of this case to determine whether it leads first, to the inference of disproportionality, and, if it does, to complete the analysis required under *Solem v. Helm*, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983), to determine whether the sentence, under the particular circumstances of this case, violates the Eighth Amendment proscription against cruel and unusual punishment.

The majority opinion sets forth numerous factors to be taken into consideration in making the threshold determination of whether

---

7. *See, e.g.,* Mo.Rev.Stat. § 568.045 (Vernon Supp.1994) (amended in 1990 to increase grade of offense from misdemeanor to felony); N.M.Stat.Ann. § 30–6–1(C)(1) (Michie 1994) (amended in 1989 to increase grade of offense and penalty from fourth degree felony to third degree felony); N.C.Gen.Stat. § 14–318.4 (1994) (effective Jan. 1, 1995, increasing penalty from 10 years to 30 years), § 14–318.2 (1994) (effective Jan. 1, 1995, increasing grade of offense from general to Class 1 misdemeanor); Okla. Stat.Ann. tit. 21, § 843 (Supp.1994) (amended in 1989 to increase penalty to maximum of life imprisonment); Pa.Cons.Stat.Ann. § 18–4304 (1988) (increasing maximum penalty from 2 years to 5 years); S.C.Code Ann. § 20–7–50 (Supp.1993) (amended in 1993 to increase grade of offense from misdemeanor to felony and increasing maximum penalty to 10 years); Tex.Penal Code Ann. § 22.041(d) (West 1994) (amended in 1993 to increase grade of offense from misdemeanor to felony); Wis.Stat.Ann. § 948.03 (Supp.1993) (amended in 1987 to increase grade of offense from Class E to Class C felony).

the sentence is grossly disproportionate to the gravity of the offense.

This opinion will discuss the same factors as set forth by the majority and the additional factor recognized by *Solem*, that being the motive and intent of the defendant.

Defendant's wrongful act was the intentional placement of her two sons into a circumstance that threatened them with death. This act constitutes child abuse under Ariz. Rev.Stat.Ann. ("A.R.S.") section 13–3623(B)(1) (1989), the crime for which defendant was convicted.

The majority repeatedly refers to defendant's crime as an attempt to murder her children. Defendant was not convicted of attempted murder. If defendant had been convicted of the crime of attempted murder of her two sons, the presumptive sentences as a dangerous offense would have been 10.5 years and could have run concurrently. There also would have been no requirement that the sentences run consecutively and without the possibility of pardon or parole.

### Harm Caused or Threatened to Victims and Society; Seriousness of the Crime; Victims; and Level of Violence

Defendant did not harm her children, nor did she harm society. Defendant and her children survived the defendant's suicide attempt without suffering any ill effects. There was no violence or threat of violence to the children in this case. Nor is there any known emotional trauma to the children. Indeed, it appears that the children were unaware of any intent or conduct directed toward them.

It is undisputed that grave risks of violence and abuse toward children threaten the safety and well being of society. One need only compare the circumstances here of no harm to the children or society with the *brutality* of other Arizona cases involving actual harm in which the defendants received *lesser sentences*. *See, e.g., State v. Lopez*, 174 Ariz. 131, 847 P.2d 1078 (1992) (father beat one-year-old son severely enough to fracture skull and ribs, damage internal organs and cause death), *cert. denied*, 510 U.S. 894, 114 S.Ct. 258, 126 L.Ed.2d 210 (1993);

*State v. Poehnelt*, 150 Ariz. 136, 722 P.2d 304 (App.1985) (mother and stepfather systematically starved and beat nine year old daughter, who was discovered by police after incident in which defendants left her hog-tied and gagged in a motel room); *State v. Moyer*, 151 Ariz. 253, 727 P.2d 31 (App.1986) (defendant fractured skull and burned face of his 21 month old step-daughter).

It is grossly disproportionate to subject a woman whose thwarted suicide attempt did no harm to her children to the severe punishment meted out by the laws that protect young children from being beaten, raped, or otherwise tortured and abused.

### Other Mitigating and Aggravating Factors

As additional aggravating factors, the majority points out that defendant denies she was committing suicide or intended to harm her children, denies she had any mental health problems, and expresses no remorse for her actions. She also became a fugitive when the jury returned its verdicts though she voluntarily surrendered herself three months later. None of these "aggravating factors" played any part in the crime itself, and none are relevant to the *Solem* analysis of proportionality. *See Solem*, 463 U.S. at 292–94, 103 S.Ct. at 3011.

The mitigating factors recognized by the majority are that there was no injury to the children, defendant had no prior record of any crime, and defendant was a good parent until the commission of the crimes.

An additional mitigating factor is that the defendant's convictions and consecutive sentences arise out of a single act. Under a legislative sentencing scheme which renders each sentence mandatory and consecutive, her *actions* do not differ, but her sentence does. This mechanistic sentencing approach sometimes results in extremely long terms of incarceration.

The majority suggests that it is inappropriate to compare defendant's crime involving a single act with two victims to other cases involving child abuse where there was only one child involved. The harm done to the children who were beaten, starved, burned

and hog-tied were vastly out of proportion to the harm done in this case which was none. Therefore, receipt of a greater punishment is grossly disproportionate.

Additionally, the majority argues that such cases involved shorter presumptive terms, and that the state legislature enacted the Dangerous Crimes Against Children laws in response to the sentences in such cases. The argument turns on itself. If the legislature created the act in response to such horrendous cases of abuse, then it is especially important to scrutinize its application in a case such as this, where the child victims were neither harmed nor suffered any ill effects. This is especially important where a defendant's single act results in multiple sentences which are mechanistically made consecutive and mandated to be served without any possibility of parole or earlier release.

### Defendant's Motive and Intent

In *Solem*, the U.S. Supreme Court noted that motive and intent were indicative of the defendant's culpability. *Solem*, 463 U.S. at 293–94, 103 S.Ct. at 3011. The majority opinion fails to address the issue of defendant's motive, thereby ignoring a key to the *Solem* culpability analysis. Instead, the majority dismisses the fact that the jury apparently believed the defendant was suffering from extreme depression as a motive in spite of the position she took at the trial. The majority acknowledges there were "financial and emotional pressures" that were brought to bear on defendant immediately prior to the crimes, but that "unfortunately a more meaningful review of defendant's psychological condition is impossible for want of competent evidence on this issue."

It is clear that the jury believed defendant was depressed and was attempting suicide. One need only read the "suicide note" to see that defendant was depressed and felt hopeless:

To all the people who have made my life somewhat bearable;

Although none of this makes much sense to you—I just know that I cannot put my sons through the coldness & hate that goes on—People talk about love—what does that mean—your parents tell you you're out of the house when you're 18—Your spouse leaves and believes he doesn't need to pay child support—your children look up to you—what do you have to offer. Dear God—I've taken my sons with me in the hopes that we'd be somewhere away from the place we are now.

. . . . .

Jim—what a loser you are for not helping me with the boys—I tried so hard to do it by myself—I tried so hard!—You Bastard—how can anyone not want to see these two boys succeed—They deserve more than what I can offer as a single income family—Why couldn't you help us—Just with day care expenses—They're your kids.

God only knows how much I believe in life—but I look around me and see everyone lying cheating stealing no one has any morals—I'm not a 90's person—I don't want my sons to be a part of the hate we all spread around—They are beautiful & pure & no one will take that away from us—We are decent and honest . . .

Under the circumstances in which the note was written it is only reasonable to conclude that defendant's psychological condition was that of despair and extreme depression. Defendant's motive, therefore, was markedly distinct from a motive of ill-will toward her children. The only reason for taking the children with her was because she no longer had the emotional and financial resources to protect them from the lying, cheating, stealing, immorality and hatred which she perceived was all around her.

Though defendant's act is indisputably a criminal one, defendant's culpability is diminished because she was not motivated by a desire to kill her children, but by a desire to kill herself. An entirely different level of culpability would be involved if defendant set out to intentionally rid herself of her children. This is precisely the reason why *Solem* identifies motive as relevant to culpability.

### Conclusion

An analysis of the relevant factors shows that this case is, indeed, one of the "rare

cases" in which the sentences imposed reach the threshold inference that they were grossly disproportionate to the crimes committed, requiring us, as the reviewing court, to analyze punishments imposed in Arizona and in other states in order to validate the inference. *State v. Bartlett*, 171 Ariz. 302, 830 P.2d 823, *cert. denied*, 506 U.S. 992, 113 S.Ct. 511, 121 L.Ed.2d 445 (1992).

## Punishments Imposed for Other Crimes of Child Abuse in Arizona

The child abuse statute under which defendant was convicted was enacted into law in 1978. Sentencing enhancement for dangerous crimes against children became effective in May, 1985. Before that time, the presumptive sentence for conviction under A.R.S. section 13–3623(B)(1) was 10.5 years. Still in existence is A.R.S. section 13–3619 which treats the crime of child abuse as a misdemeanor, even in instances where the custodial adult knowingly causes the child's life to be endangered. The choice of which statute to select for prosecution is made by the prosecutor.

The sentence received by defendant was the harshest penalty ever imposed in an Arizona child abuse prosecution reported in our cases. Of even greater relevancy to the inquiry here is the fact that a review of other child abuse cases in Arizona reveals that more serious abuses have been punished less severely.

In *State v. Tamplin*, 146 Ariz. 377, 706 P.2d 389 (App.1985), the defendant was convicted of violating A.R.S. section 13–3623(B) for having caused second degree burns on a two-year-old boy by placing him in hot water. The defendant was sentenced to prison for 6 years.

In *State v. Poehnelt*, the defendants, charged under A.R.S. section 13–3623, were convicted of tying up, gagging, and leaving a nine-year-old girl in a motel room. She had bruises on her face, scars that were consistent with her testimony that she had been struck with pliers, two broken fingers caused by a hammer, and severe mental and emotional injuries. She was also very malnourished and had been starved for such a period (perhaps as long as five years) that her growth had been stunted. The defendants were sentenced to 10.5 years in prison.

In *State v. Moyer*, the defendant fractured the skull and burned the face of his 21 month old stepdaughter. The defendant received a sentence of 5 years in prison.

In *State v. Lopez*, the defendant beat his one year old son severely enough to fracture the child's skull and ribs, damage internal organs and cause death. The defendant was sentenced to 22 years in prison on the child abuse conviction. (Prior to sentencing in the present case, George Molina Lopez had the distinction of receiving the harshest penalty ever imposed in an Arizona child abuse prosecution and reported in our case law.)

Thus, a comparison of the punishments imposed for the same crime in Arizona reveals that defendant in this case was sentenced disproportionately.

## Punishments Imposed For Other Crimes In Arizona More Serious than the Crime Charged in this Case

The child abuse that occurred here did not involve violence or actual harm to the children. It involved the intentional placement of the children into a circumstance likely to result in death. A number of dangerous offenses in Arizona are punished with less severity.[1] As can be seen from the table below, the presumptive sentences are significantly shorter than 17 years, assuming in each instance that the victims are over 15 years old. Moreover, there is no requirement that multiple sentences imposed for these crimes be served consecutively.

---

1. A.R.S. section 13–604(I) defines dangerous offense as an offense if it involved the intentional or knowing infliction of serious physical injury or the use or exhibition of a deadly weapon or dangerous instrument.

| Crime | A.R.S. Section | Presumptive Term |
|---|---|---|
| Attempted Murder | 13–1001 | 10.5 years |
| Manslaughter | 13–1103 | 10.5 years |
| Kidnapping | 13–1304 | 10.5 years |
| Armed Robbery | 13–1904 | 10.5 years |
| Aggravated Assault | 13–1204 | 7.5 years |
| Sexual Assault | 13–1406 | 10.5 years |
| Arson of an Occupied Structure | 13–1704 | 10.5 years |
| Armed Burglary of a Residential Structure | 13–1508 | 10.5 years |

## Punishments Imposed For the Same Crime In Other States

Examination of sentencing ranges in other jurisdictions reveals that Arizona imposes the harshest penalties in the nation for child abuse. This dissenting opinion is not in any way suggesting that Arizona's punishment laws must be revised. The fact that Arizona "has the most severe punishment for a particular crime does not by itself render the punishment grossly disproportionate." *Harmelin v. Michigan*, 501 U.S. 957, 1000, 111 S.Ct. 2680, 2704, 115 L.Ed.2d 836 (1991) (Kennedy, J., concurring). It does, however, require us to insure that such harsh penalties are not unconstitutionally applied under the circumstances of a particular case.

A typical sentence for the same crime in other states would be dramatically less severe. Tables I and II, attached to this opinion, show that defendant's crime would be a misdemeanor in many other jurisdictions. The fact that no actual injury occurred, combined with a number of mitigating factors present in this case, leads to the conclusion that defendant would probably have received probation in many other states.

The harshest maximum penalty for a child abuse conviction in any other state is fifteen years imprisonment, subject to probation. Eight other jurisdictions have the next highest maximum penalty of ten years. Considering that Arizona alone requires consecutive service of prison sentences imposed under the child abuse statute, defendant stands to serve *at least* 4 more years in prison in Arizona than she would serve had she been convicted of a similar crime in any other state. Because her two convictions arose out of a single act, it is realistic to conclude that defendant is probably serving 19 more years in Arizona than she would serve in that state. Lack of eligibility for probation or parole further exacerbates the disproportionality of her punishment.

Defendant's consecutive, mandatory 17–year sentences stand in stark contrast to punishment for the same act in other states. The comparative analysis confirms that defendant's sentences are grossly disproportionate to the crimes for which she was convicted.

## Conclusion and Appropriate Disposition

Defendant's sentences violate the Eighth Amendment's proscription against cruel and unusual punishment because they are grossly disproportionate to the crimes she committed in this case. Under other circumstances, the application of the statute may be fully appropriate.

The proper disposition of this case is to follow what the Arizona Supreme Court did in *State v. Bartlett*, 164 Ariz. 229, 792 P.2d 692 (1990), *vacated*, 501 U.S. 1246, 111 S.Ct. 2880, 115 L.Ed.2d 1046 (1991), and bar the application of the sentencing provisions of A.R.S. section 13–604.01 to defendant under the facts and circumstances of this case, leaving defendant to be sentenced the same as any other class 2 felon to whom the provisions of A.R.S. section 13–604.01 would not apply. On re-sentencing, a wide discretionary range of sentencing would be available to the trial court to proportionately tailor the harshness of the penalty to the severity of the crimes.

Accordingly, this case should be remanded to the trial court for resentencing.

NOTE: The Honorable Stephen A. Gerst, Maricopa County Superior Court Judge, was authorized to participate in the disposition of this matter by the Chief Justice of the Arizona Supreme Court pursuant to article 6, section 3 of the Arizona Constitution.

### TABLE I

States Where Conviction Requires a Showing that Defendant's Actions or
Omissions Caused Actual Physical Harm:

Alaska
Arkansas
California
Florida
Georgia
Hawaii
Maryland
Massachusetts
Michigan
Minnesota
North Dakota
Rhode Island
West Virginia
Wisconsin

### TABLE II

Comparison of States Where Statute Requires Proof
that Defendant Exposed Child Victim to Significant Risk
or Likelihood of Serious Physical Harm or Death *

| | | | | |
|---|---|---|---|---|
| Alabama | 1–10 years | Felony | Yes | 26–15–3 |
| Arizona | 17 years | Felony | No | 13–3623(B)(1) |
| Colorado | 3–12 months | Misdemeanor | Yes | 18–6–401(1) |
| Connecticut | Up to 10 years | Felony | Yes | 53–21 |
| Delaware | Up to 1 year | Misdemeanor | Yes | 11–1102(1)(a) |
| Idaho | Up to 10 years | Discretionary | Yes | 18–1501(1) |
| Illinois | Up to 1 year | Misdemeanor | Yes | 720–5/12–21.6 |
| Indiana | 1.5 years | Felony | Yes | 35–46–1–4–(a)(1) |
| Iowa | Up to 2 years | Misdemeanor | Yes | 726.6(1)(a) |
| Kansas | Up to 1 year | Misdemeanor | Yes | 21–3608(a) |
| Kentucky | 5 to 10 years | Felony | Yes | 508.100(1)(b) |
| Maine | Up to 1 year | | Yes | 17–554(1)(C) |
| Mississippi | Up to 1 year | Misdemeanor | Yes | 97–5–39(1) |
| Missouri | Up to 5 years | Felony | Yes | 658.045 |
| Nebraska | Up to 5 years | Felony | Yes | 28–707(a) |
| Nevada | Up to 1 year | Misdemeanor | Yes | 200.508(1)(a) |
| New Hampshire | Up to 1 year | Misdemeanor | Yes | 639:3(I) |
| New Jersey | 5 to 10 years | Felony | Yes | 2C:12–1(b)(1) |
| New Mexico | 3 years | Felony | Yes | 30–6–1(c) |
| New York | Up to 1 year | Misdemeanor | Yes | 39–260.10(1) |
| N. Carolina | Up to 2 years | Misdemeanor | Yes | 14–318.2(a) |
| Ohio | Up to 6 months | Misdemeanor | Yes | 2919.22(A) |
| Oregon | Up to 1 year | Misdemeanor | Yes | 163.195 |
| Pennsylvania | Up to 5 years | Misdemeanor | Yes | 18–4304 |
| S. Carolina | Up to 10 years | Felony | Yes | 20–7–50 |
| S. Dakota | Up to 10 years | Felony | Yes | 26–10–1 |
| Tennessee | Up to 1 year | Misdemeanor | Yes | 39–15–401 |
| Texas | Up to 2 years | Felony | Yes | 22.041(c) |
| Utah | 1–15 years | Felony | Yes | 76–5–109 |
| Vermont | Up to 2 years | | Yes | 13–1304 |
| Virginia | 2–10 years | Felony | Yes | 18.2–371.1(A) |
| Washington | Up to 5 years | Felony | Yes | 9A.42.030(1) |
| Wyoming | Up to 1 year | Misdemeanor | Yes | 6–4–403(a)(ii) |

* Abstracted from Appendix to Appellant's Opening Brief